IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:23-cv-952 |
| ) | |
| CITY OF ST. LOUIS, ) | JURY TRIAL DEMANDED |
| ) | |
| and ) | |
| ) | |
| MAYOR TISHAURA JONES ) | |
| in her individual and official capacities, ) | |
| ) | |
| and ) | |
| ) | |
| DANIEL ISOM, ) | |
| in his individual capacity, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

## PARTIES AND JURISDICTION

1. At all times relevant herein, Plaintiff, Michael Sack (hereinafter "Sack"), was and is a resident of Jefferson County, Missouri and a citizen of the United States of America. He is employed by the City of St. Louis (hereinafter "City") through the St. Louis Metropolitan Police Department (hereinafter "Department").  He is Caucasian.

2. At all times relevant herein, Defendant City of St. Louis (hereinafter "City") was and is a charter city in the State of Missouri, and therefore, a pollical subdivision of the state.  It is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Defendant Mayor Tishaura Jones is and was at all times relevant herein the Mayor of the City of St. Louis, who resides in the City. She is African American. She is sued in her official and individual capacities.

4. Defendant Daniel Isom was at all times relevant herein the Interim Public Safety Director of the City of St. Louis. He is African American. He was previously ordered to pay punitive damages by a federal jury related to his intentional discrimination against a different Caucasian officer of the Department. He is sued in his individual capacity only.

5. The adverse employment action Sack suffered as set forth in more detail below occurred in the City of St. Louis, State of Missouri, within the Eastern Division of the Eastern District of Missouri.

6. This action is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 2000e *et seq.*, as well as the Equal Protection Clause of the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

8. Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## FACTS COMMON TO ALL COUNTS

9. Sack began his employment with the City/Department in 1994 as a patrol officer.

10. The City has a history of racial discrimination against Department employees, both African American and Caucasian. By way of example, but not exhaustive:

    a. The City discriminated against Caucasian Sgt. David Bonenberger when it refused to transfer/assign him to the Police Academy because of his race (Caucasian), resulting in a jury verdict of $620,000.00, including $400,000.00 in punitive damages. Evidence showed not only that a lieutenant in the Department admitted Bonenberger was

not given the academy position because of his race, but that he was more qualified for it as one of the best street officers, while the African American officer selected to oversee the training of police officers had "good accounting skills." In addition to the monetary damages and attorney's fees awarded, the federal court prohibited illegal discrimination based on race in future employment decisions by the Department. Later the Department retaliated against Bonenberger, resulting in a settlement of $725,000.00.

  b. The City discriminated against Caucasian Major Michael Caruso when it created a new lieutenant colonel position shortly after eliminating positions at this rank and then promoted an African American major into it because all the lieutenant colonels at the time were Caucasian. Caruso had more time with the Department, more education, and scored higher on the promotion test than the major promoted. Then Chief Samuel Dotson (Caucasian) told a different African American major that he needed to promote either her or the African American major who was promoted into the position. The City settled Caruso's lawsuit for $300,000.00.

  c. The City discriminated against Captain Ryan Cousins when it fired him because of his race (African American). In this case, the City's own Civil Service Commission found that Cousins was discriminated against because of his race and ordered his reinstatement. The City ultimately paid Cousins over 1.1 million dollars.

  d. As set forth in more detail below, Lt. Col. Lawrence O'Toole (hereinafter "O'Toole") sued the City when he was not promoted to Commissioner/Chief in December 2017 because of his race (Caucasian).

  e. Most recently, Sgt. Heather Taylor, now Deputy Director of Public Safety, sued the City for being subjected to a racially hostile work environment and

retaliation by the Department. On March 3, 2023, a jury awarded her $300,000.00 in damages. Additionally, the court ordered the City to pay $321,681.38 to Taylor's attorneys for their fees in representing her.

11. The Department's Commissioner/Chief serves at the rank of Colonel and is its highest-ranking officer. It is a competitive position under the City's Civil Service Commission.

12. Pursuant to Article XIII, § 15 of the City Charter, the Department is under the Department of Public Safety. The Commissioner/Chief reports to the Director of Public Safety.

13. The Director of Public Safety is the appointing authority for the Commissioner/Chief. In the City, the appointing authority has the power "to hire, promote, discipline and/or discharge employees within their respective organizational units."

14. On December 28, 2017, John Hayden (hereinafter "Hayden"), African American, was promoted to Commissioner/Chief. He was selected over Interim Commissioner/Chief O'Toole.

15. When Hayden was promoted over O'Toole, O'Toole sued for race discrimination and retaliation.

16. O'Toole's lawsuit settled in or about May 2022, with the City paying O'Toole over $160,000.00. This settlement was reported to the public on May 16, 2022.

17. Hayden was Commissioner/Chief from December 28, 2017, until he retired on June 18, 2022. Hayden originally planned to retire in February 2022, and first announced his retirement in September 2021.

18. Shortly after Hayden first announced his retirement in September 2021, the City began a nationwide search for his replacement. According to the City's posting for the Commissioner/Chief position, applications were to be accepted until a sufficient number were

received to fill the anticipated vacancy.

19. Both O'Toole and Sack applied to become the next Commissioner/Chief, as well as twenty-seven (27) other applicants.

20. Seven candidates (2 internal and 5 external) were certified as meeting the qualifications for the position. One qualified candidate withdrew from the process. As a result, six (6) candidates were invited to participate in testing for the Commissioner/Chief position.

21. Testing for the position was administered by Management & Personnel Systems, Inc., a nationally accredited and recognized testing company, who upon information and belief, was the testing service used to select Commissioners/Chiefs Dotson and Hayden, as well as Fire Chief Dennis Jenkerson.

22. The internal candidates were tested for the position. The external candidates did not appear on the testing date. Virtual testing was ruled out by the Department of Personnel due to security concerns about cheating. As a result, the 2 internal candidates completed the process to be considered for Commissioner/Chief.

23. On or about January 7, 2022, Jones stated that she was not going to pick either of the candidates certified by the Department of Personnel because: ""I only had two white male candidates to choose from and St. Louis is more diverse than white males, our police department is more diverse…"

24. Jones' race-based reason for reopening the Commissioner/Chief search was consistent with the pledge she made when running for mayor that she wanted to prioritize diversity in promotions within the Department.

25. On or about March 16, 2022, Sack was informed that his final overall score on the promotion test was 100 and his rank on the eligibility list was number one. He was told to

contact the Director of Public Safety within seven (7) days to arrange an interview.

26. Sack called the Director as instructed. He was never scheduled for an interview.

27. Consistent with Civil Service Rule VII, § 3(c), the Director of Personnel certified the two eligible and qualified candidates for the Public Safety Director to choose from as the next Commissioner/Chief. According to this Rule, additional eligibles can be requested from the Department of Personnel when there are less than six (6) candidates for a position only "[i]f the appointing authority is unable to fill the vacancy from the list provided."

28. Sack was consistently promoted through the ranks, becoming a lieutenant colonel (2nd highest rank) on October 17, 2019. As a lieutenant colonel in the Department, he was the Commander of Professional Standards and the Bureau of Community Policing. He served as the Commander of the Bureau of Community Policing until June 2022, when he was appointed the Interim Commissioner/Chief by Jones, showing he was qualified for the position.

29. Similarly, O'Toole was consistently promoted throughout his career, reaching the rank of lieutenant colonel in February 2012. From July 2015 through April 2017, O'Toole was the Assistant Chief of Police and from April through December 2017, he was the Interim Commissioner/Chief.

30. Both Sack and O'Toole consistently exceeded expectations when performing their duties for the Department, reflected in their continuous advancement ultimately to the rank of lieutenant colonel, the rank below that of the Commissioner/Chief.

31. The Appointing Authority was able to fill the vacancy for Commissioner/Chief from the list of eligibles provided by the Department of Personnel because both Sack and O'Toole were more than qualified to serve as the Department's Commissioner/Chief as evidenced by both serving as Interim Commissioner/Chief.

6

32. The City violated its Charter when it reopened the Commissioner/Chief search because the qualified candidates to choose from are Caucasian.

33. As part of his settlement with the City, O'Toole retired from the City/Department on May 21, 2022, leaving Sack as the only remaining candidate for the Commissioner/Chief position.

34. Instead of promoting Sack consistent with Civil Service Rule VII, § 3(c), on or about May 18, 2022, Jones informed Sack and the public that she was starting a new search for Commissioner/Chief, to be conducted by the Boulware Group (managing director African American) with assistance from the Center for Policing Equity (which among other things, pursues strategies to address racist behaviors, policies, and practices in law enforcement), with the Regional Business Counsel covering any costs. Upon information an belief, no request for proposals was issued by the City before these entities were hired to be part of the new search.

35. This new search lowered the minimum qualifications for the position to, upon information and belief, allow more African American officers within the Department to apply. The original search required ten (10) years of senior command rank experience at the rank of captain or higher. The reopened search only required five (5) years of experience at the rank of police commander or higher.

36. This new Commissioner/Chief search was announced after Jones appointed a second African American Interim Director of Personnel in February 2022. This appointment was made after the Civil Service Commission changed its rules to allow the mayor to appoint an interim director outside the Department of Personnel without minimum qualifications, who could be removed at any time by the mayor. This Interim Director of Personnel had a chemistry degree and was most recently Senior Vice President of Operations and Marketing for Spire (previously

Laclede Gas).

37. This interim appointment was made after a different African American Interim Director of Personnel was appointed in December 2021, after the Civil Service Commission amended its rules to appoint her. She was replaced in February 2022, even though one of the Commissioners commended her for doing a fantastic job. She had over 35 years of experience working in the City's Department of Personnel.

38. Before Defendants reopened the Commissioner/Chief search because there were only 2 Caucasians to choose from, the City was advised by the City Counselor's Office that the list was valid and the search should not be reopened. Upon information and belief, the City reopened the search because the mayor wanted it reopened for the race-based reason set forth in ¶ 23 above.

39. Excluding the city courts, since Jones was elected mayor, she has appointed 12 people to cabinet level positions, who were not already in the position when she was elected mayor. Eighty-three (83%) percent of the positions filled by the mayor with new people (10 of 12) are African American.

40. In November 2022 as part of this new search, the City initially announced that three (3) finalists would participate in a town hall meeting. It then said four (4) finalists would participate in this meeting to be held on December 6, 2022.

41. Two (2) of the finalists for Commissioner/Chief who participated in the town hall meeting are Caucasian and two (2) are African American.

42. Sack was the only internal candidate identified as a finalist.

43. Upon information and belief, Defendants intended to select an African American Commissioner/Chief but were unable to do so because both African American finalists declined

8

the position. One of the African American finalists publicly announced he had withdrawn his name from consideration on or about December 11, 2022. The other African American finalist was offered the position but declined it when the City/Department could not get him the car he wanted, in addition to the compensation package offered.

44. On or about December 12, 2022, Sack was notified that he would not be selected as the Commissioner/Chief.

45. Sack was not selected even after an active shooter situation at Central & Visual Performing Arts High School on October 24, 2022 (when he was interim Commissioner/Chief) resulted in the loss of only two lives due to the quick and decisive response of police officers under his command. He was commended for his communication with the public on the day of the incident and over the days that followed. He was sought out by the Missouri Police Chief's Association to present to a class of commissioned supervisors and commanders who were pursuing a certificate from the Missouri Police Chief's Command College on how to handle an active shooter situation. In addition, he was asked to present a more detailed analysis of the active shooter incident at this past year's Missouri Police Chief's Annual Conference.

46. Upon information and belief, he was not selected for the Commissioner/Chief position because his selection after the 2 African American finalists declined it would have shown that he was always qualified to be the City's next Commissioner/Chief but was not selected before the search was reopened because he did not reflect the diversity (race) the mayor stated she wanted for the position. His selection also would have highlighted the time and money wasted in reopening the search.

47. On or about December 14, 2022, Robert Tracy (hereinafter "Tracy") was named Commissioner/Chief when no African American candidate was left to select. Upon information

9

and belief, he was selected for the position in violation of the City's own Civil Service rules.

48. Tracy was selected Commissioner/Chief even though the Wilmington City Council had voted no confidence in him while he was Chief of the Wilmington Police Department due to a lack of diversity in leadership positions in that department, among other things.

49. Tracy was selected as Commissioner/Chief even though the President of the Wilmington City Council (himself African American) had expressed concern that Tracy "demonstrated resistance and a pattern of failure to provide information when requested, including any ideas to increase communication, transparency, diversity and police reform."

50. According to the Police Commissioner job description issued by the City of St. Louis, the Commissioner is expected to "play a vital role in citywide efforts to re-envision public safety."

51. Tracy was selected as the Commissioner/Chief even though the President of the Wilmington City Council publicly stated that he could not sign off on recommending Tracy for the job if he spoke with his colleagues on the St. Louis Board of Aldermen. He explained: "it was frustrating being on council and never hearing from the Chief of Police."

52. Tracy was selected Commissioner/Chief even though during his tenure as Chief in Wilmington, it was reported that an African American police officer was given a trophy by a Caucasian supervisor reading, "Whitest Black Guy in the Office Award," which offended other African American officers.



53.     The Department has long attempted to eradicate this kind of racial hostility, instead of tolerating it like Wilmington.  By way of example but not exhaustive, in August 2014, then Chief Dotson sent a department-wide email that stated, in part: "Let it be known that racism or discrimination of any kind will not be tolerated within our police family. If any member of this department ... engages in this type of activity, they will not have a place here with us."

54.     Had race not entered into the Defendants' decision to reject the qualified Caucasian finalists for Chief/Commissioner in May 2022 and reopen the search, the City:

    a.     Would not have a Commissioner/Chief who has conflicts of interest, to include but not necessarily limited to being paid by both the City, as an employee, and the Saint Louis Police Foundation, as an "independent contractor," for doing the job of Commissioner/Chief.  Sack was willing to serve as Commissioner/Chief for the $175,000.00 salary offered by the City.

    b.     Would have additional financial resources to fight crime because those resources would not have been used to hire an African American civilian Chief of Staff

11

for Tracy from Wilmington, Delaware. Upon information and belief, this Chief of Staff was also hired outside the Civil Service process and is being paid about what lieutenant colonels in the Department are paid.

  c. Would have a Commissioner/Chief with knowledge of the City of St. Louis, who reports to the Director of Public Safety, instead of directly to a mayor with no law enforcement experience.

55. Sack timely filed a Charge of Discrimination with the EEOC on January 5, 2023 at Charge No. 560-2023-00867.

56. He was issued a right to sue letter by the EEOC on June 20, 2023 and filed the present lawsuit within 90 days of its issuance.

## COUNT I
## PLAINTIFF'S TITLE VII CLAIM FOR RACE DISCRIMINATION

For Count I of Plaintiff's cause of action against Defendant City of St. Louis, Plaintiff states as follows:

57. Sack alleges and incorporates by reference as if fully set forth herein all previous allegations of his Complaint.

58. Sack applied to be the Commissioner/Chief of the Department.

59. Sack suffered an adverse employment action in May 2022 when he was not selected to be the Commissioner/Chief, despite being qualified for the position, because of his race when the application process was reopened,

60. Any purported reason(s) that Defendant might offer for not selecting Sack as the Commissioner/Chief and reopening the application process is/are nothing but pretext to conceal the Defendant's illegal race-based discrimination.

61. The actions and/or practices complained of herein were in violation of

Sack's rights secured by 42 U.S.C. §2000e *et seq.*

62. As a direct and proximate result of the acts of the Defendant as alleged herein, Sack was not promoted to Commissioner/Chief. As a result, he has suffered and will continue to suffer lost income and a resulting loss in his retirement benefits because he was not promoted.

63. As a direct and proximate result of the acts of the Defendant as alleged herein, Sack has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

WHEREFORE, Plaintiff Michael Sack prays this Court enter judgment in his favor and against Defendant City of St. Louis and thereafter order it to make him whole by awarding him damages for his lost wages and benefits, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, stress, and loss of personal and professional reputation. Plaintiff further requests that this Court award him his reasonable costs and attorney's fees, and such other and further relief as may appear to the Court to be equitable and just under the totality of the circumstances.

## COUNT II
## VIOLATION OF PLAINTIFF'S RIGHTS UNDER 42 U.S.C. SECTION 1981

For Count II of Plaintiff's cause of action against Defendants City of St. Louis, Jones, and Isom, Plaintiff states as follows:

64. Sack alleges and incorporates by reference as if fully set forth herein all previous allegations of his Complaint.

65. The acts complained of herein were made by those with final policymaking authority: the Director of Public Safety (the Department's appointing authority) and the Mayor

13

of the City of St. Louis.

66. Sack's race was a determining factor, motivating factor, or played a part in the Defendants' decision not to promote him and to reopen the application process, even though he was qualified to be Commissioner/Chief.

67. Any stated reason(s) for not promoting Sack when he was qualified for the position is/are nothing but pretext to hide race discrimination.

68. As a direct and proximate result of the acts of the Defendants as alleged herein, Sack was not promoted to Commissioner/Chief.  As a result, he has suffered and will continue to suffer lost income, and a resulting loss in his retirement benefits, because he was not promoted.

69. As a direct and proximate result of the acts of the Defendant as alleged herein, Sack has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

70. The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Sack's statutory rights as set forth herein, justifying an award of punitive damages against the Defendants in their individual capacities to punish them and deter them and others from similar conduct in the future.  This is particularly true when a previous award of punitive damages against Defendant Isom did not deter him from repeating this misconduct.

WHEREFORE, Plaintiff Michael Sack prays this Court enter judgment in his favor and against Defendants City of St. Louis, Tishaura Jones, and Daniel Isom, and thereafter order them to make him whole by awarding him damages for his lost wages and benefits, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life,

humiliation, stress, and loss of personal and professional reputation.  Plaintiff further requests that this Court award him punitive damages against the Defendants named herein in their individual capacities in such sum as will serve to punish them and to deter them and others from like conduct in the future, award him his reasonable costs and attorney's fees, and such other and further relief as may appear to the Court to be equitable and just under the totality of the circumstances.

## COUNT III
## VIOLATION OF PLAINTIFF'S RIGHT TO EQUAL PROTECTION COGNIZABLE UNDER 42 U.S.C. SECTION 1983

For Count III of Plaintiff's cause of action against Defendants City of St. Louis, Jones, and Isom, Plaintiff states as follows:

71. Plaintiff incorporates by reference as if fully set forth herein all previous paragraphs of his Complaint.

72. The acts complained of herein were made by those with final policymaking authority: the Director of Public Safety (the Department's appointing authority) and the Mayor of the City of St. Louis.

73. Defendants, acting under color of state law, deliberately acted against Sack because of his race as set forth above by refusing to promote him to the position of Chief/Commissioner for which he was qualified but instead reopening the application process to select an African American Chief/Commissioner, causing him to be deprived of his rights secured by the Constitution and laws of the United States.

74. The actions, policies, and/or practices complained of herein were in violation of 42 U.S.C. §1983 in that they have denied Sack of his right to equal protection under the law secured by the 14th Amendment to the United States Constitution.

75. The actions complained of herein were taken by those with final policymaking authority and/or approved by those with final policymaking authority as part of a deliberate plan to discriminate against Sack because of his race.

76. As a direct and proximate result of the acts of the Defendants as alleged herein, Sack was not selected Commissioner/Chief but instead the search was reopened to find an African American candidate to fill the position, resulting in lost wages and retirement benefits.

77. As a direct and proximate result of the acts of the Defendants as alleged herein, Sack has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

78. The conduct of the individual Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Sack's constitutional rights as set forth above, justifying an award of punitive damages against these Defendants in their individual capacities to punish them and to deter them and others from the same or similar misconduct in the future. This is particularly true when a previous award of punitive damages against Defendant Isom did not deter him from repeating this misconduct.

WHEREFORE, Plaintiff Michael Sack prays this Court enter judgment in his favor and against Defendants City of St. Louis, Tishaura Jones, and Daniel Isom, and thereafter order them to make him whole by awarding him damages for his lost wages and benefits, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, stress, and loss of personal and professional reputation. Plaintiff further requests that this Court award him punitive damages against the Defendants named herein in their individual capacities in such sum as will serve to punish them and to deter them and others from

like conduct in the future, award him his reasonable costs and attorney's fees, and such other and further relief as may appear to the Court to be equitable and just under the totality of the circumstances.

## COUNT IV
## CONSPIRACY TO VIOLATE CIVIL RIGHTS

For Count IV of Plaintiff's cause of action against Defendants Jones and Isom, Plaintiff states as follows:

79. Plaintiff incorporates by reference as if fully set forth herein all previous paragraphs of his Complaint.

80. Defendants, acting under color of state law, conspired among themselves and with others who are not elected officials or employees of the City, and as a result reached a mutual understanding that they would not promote Sack but would reopen the applications for the Commissioner/Chief position because of Sack's race. Additionally, but without waiver of the foregoing, Defendants conspired among themselves and with others to undertake a course of conduct to protect each other from the consequences of their constitutional and statutory violations, which in furtherance of the conspiracy violated Sack's constitutional right to equal protection under the law and federal statutory right to be free from race discrimination.

81. In furtherance of this conspiracy, Defendants with others took the following overt acts:

    a.    Announced in January 2022 that the search would be reopened because: "I only had two white male candidates to choose from and St. Louis is more diverse than white males, our police department is more diverse…"

    b.    Refused to schedule an interview with Sack.

    c.    Refused to select Sack (or O'Toole) for the position of Commissioner/

17

Chief because of their race, even though they were qualified for it.

  d. Settled the lawsuit filed by O'Toole with the condition that he retire from the Department.

  e. In May 2022, reopened the application process for the Commissioner/Chief position to ensure that an African American candidate could be offered the position.

  f. Used the Boulware Group and Center for Policing Equity to reopen the search, upon information and belief, without using the City's request for proposal process.

  g. Used the Regional Business Council to fund the new search.

  h. Used the Saint Louis Police Foundation to secure additional compensation for the position.

  i. Upon information and belief, offered the Commissioner/Chief position to the two African American finalists, who both rejected the position, leaving only Caucasian applicants from which to choose.

82. Defendants, with others, shared the general conspiratorial objective to refuse to promote Sack to the position of Commissioner/Chief for which he was qualified because of his race, but instead reopen the application process so that an African American candidate could be selected Commissioner/Chief.

83. Such conduct is so pervasive in the City and/or engaged in by those with final policymaking authority that the City's elected and appointed officials are effectively insulated from civil liability, and therefore, Defendants felt free to engage in the misconduct described above without fear of consequence.  By way of example, but not exhaustive, Defendant Isom

was selected as the Director of Public Safety, the appointing authority, even though a federal jury had previously found that he intentionally discriminated against a Caucasian police officer of the same Department and ordered him to pay punitive damages.

84. Defendants and others, who are not elected officials or employees of the City, furthered the conspiracy by participating in it from its inception or by participating in the cover-up thereof and/or ignoring the course of conduct set forth herein so as to insulate themselves and others from liability for the outrageous and unlawful acts of the Defendants as described above, showing a tacit understanding to carry out the prohibited conduct.

85. As a direct and proximate result of the conspiracy amongst the Defendants and others, and in furtherance thereof, Sack was not promoted to Commissioner/Chief because of his race, but instead the application process was reopened to appoint an African American Commissioner/Chief. This conspiracy deprived Sack of his constitutional right to equal protection of the law secured by the 14th Amendment to the United States Constitution and of his federal statutory right to be free from illegal discrimination.

86. As a direct and proximate result of the conspiracy amongst the Defendants and others, and in furtherance thereof, Sack was not selected as the Commissioner/Chief. As a result, he had suffered and will continue to suffer lost wages and retirement benefits.

87. As a direct and proximate result of the conspiracy amongst the Defendants and others as alleged herein, Sack has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

88. The conduct of these Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Sack's statutory and constitutional rights as set forth

above, justifying an award of punitive damages against these Defendants in their individual capacities to punish them and to deter them and others from the same or similar misconduct in the future. This is particularly true when a previous award of punitive damages against Defendant Isom did not deter him from repeating this misconduct.

WHEREFORE, Plaintiff Michael Sack prays this Court enter judgment in his favor and against Defendants Tishaura Jones and Daniel Isom, and thereafter order them to make him whole by awarding him damages for his lost wages and benefits, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, stress, and loss of personal and professional reputation. Plaintiff further requests that this Court award him punitive damages against the Defendants named herein in their individual capacities in such sum as will serve to punish them and to deter them and others from like conduct in the future, award him his reasonable costs and attorney's fees, and such other and further relief as may appear to the Court to be equitable and just under the totality of the circumstances.

Respectfully submitted,

**PETRUSKA LAW, LLC**

By:     /s/ Lynette M. Petruska
Lynette M. Petruska, Bar No. 41212
lpetruska@att.net
1291 Andrew Dr.
Glendale, MO 63122
314-954-5031

Attorney for Plaintiff