UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SACK, | ) |
| Plaintiff, | ) ) ) |
| v. | )   Case No. 4:23-cv-00952-SEP |
| CITY OF ST. LOUIS, et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM AND ORDER**

Before the Court is Defendants' Motion to Dismiss, Doc. [10]. For the reasons set forth below, the motion is granted in part and denied in part.

**FACTS AND BACKGROUND**[1]

On December 28, 2017, John Hayden, an African American male, was promoted to Commissioner/Chief of the St. Louis Metropolitan Police Department. Doc. [1] ¶ 14. Hayden was selected over Interim Commissioner/Chief Lawrence O'Toole, a white male. *Id*. O'Toole filed a lawsuit against the City for race discrimination and retaliation. *Id*. ¶ 15. The lawsuit was settled around May 2022, with the City paying O'Toole over $160,000.00. *Id*. ¶ 16.

Hayden announced his retirement as Commissioner/Chief in September 2021. *Id*. ¶ 17. Shortly thereafter, the City began a nationwide search for his replacement. *Id*. ¶ 18. The City's posting of the position stated that "applications were to be accepted until a sufficient number were received to fill the anticipated vacancy." *Id*. ¶ 18. Plaintiff Michael Sack—a white male who had started with the Department in 1994 and had been promoted through the ranks, becoming a lieutenant colonel on October 17, 2019—applied for the position, along with O'Toole and 27 other applicants. *Id*. ¶¶ 1, 19, 28. Seven candidates—two internal and five external—were certified as meeting the qualifications for the position. *Id*. ¶ 20. One of those seven candidates withdrew, leaving six candidates. *Id*. The six candidates were then invited to participate in testing for the position, which was administered by Management & Personnel Systems, Inc., a nationally accredited and recognized testing company. *Id*. ¶¶ 20-21. The external candidates did not appear on the testing date, and the Department of Personnel ruled out

---

[1] For purposes of the motion to dismiss, the Court takes the factual allegations in the Complaint, Doc. [1], to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

1

the option of virtual testing based on cheating concerns. *Id*. ¶ 22.  The two internal candidates were therefore the only candidates to "complete[ ] the process to be considered for Commissioner/Chief." *Id*.  "Consistent with Civil Service Rule VII, § 3(c),² the Director of Personnel certified the two eligible and qualified candidates for the Public Safety Director to choose from as the next Commissioner/Chief." *Id*. ¶ 27.

On or about January 7, 2022, then-Mayor Tishaura Jones stated that she was not going to pick either of the candidates certified by the Department of Personnel:  "I only had two white male candidates to choose from and St. Louis is more diverse than white males, our police department is more diverse . . . ." *Id*. ¶ 23.  While running for Mayor, Jones had pledged to prioritize diversity in promotions within the Department. *Id*. ¶ 24.  At the time the Complaint was filed, 10 of the 12 people Mayor Jones had appointed to cabinet-level positions were African American. *Id*. ¶ 39.

On or about March 16, 2022, "Sack was informed that his final overall score on the promotion test was 100 and his rank on the eligibility list was number one." *Id*. ¶ 25.  He was told to contact the Director of Public Safety to schedule an interview. *Id*.  Plaintiff did as he was directed, but he was never scheduled for an interview. *Id*. ¶ 26.  On May 21, 2022, as part of his settlement with the City, O'Toole retired, leaving Plaintiff as the only candidate for the Commissioner/Chief position. *Id*. ¶ 33.  But instead of promoting Plaintiff consistent with Civil Service Rule VII, § 3(c), which provided that "additional eligibles can be requested from the Department of Personnel when there are less than six (6) candidates for a position only '[i]f the appointing authority is unable to fill the vacancy from the list provided[,]'" Mayor Jones informed Plaintiff and the public that she was starting a new search for Commissioner/Chief. *Id*. ¶¶ 27, 34.³  The new search was to be "conducted by the Boulware Group (managing director African American) with assistance from the Center for Policing Equity (which among other things, pursues strategies to address racist behaviors, policies, and practices in law enforcement), with the Regional Business Counsel covering any costs." *Id*. ¶ 34.  Plaintiff alleges, upon information and belief, that "no request for proposals was issued by the City before these entities

---

² The Civil Service Rules have been updated since the filing of Plaintiff's Complaint.  The references in the Complaint are to the version in effect at the time of the events giving rise to this lawsuit.

³ Civil Service Rule VIII, § 03(b) now contains the rule that additional eligibles can be requested only if the "appointing authority is unable to fill the vacancy from the list provided . . . ."

2

were hired to be part of the new search." *Id.* While the original search required ten years of senior command rank experience at the rank of captain or higher, the new search required only five years of experience at the rank of police commander or higher. *Id.* ¶ 35. Plaintiff claims, upon information and belief, that the qualifications were changed to "allow more African American officers within the Department to apply." *Id.*

As part of the new search, four finalists were selected to participate in a town hall meeting. *Id.* ¶ 40. Two of the finalists were white; two were African American. *Id.* ¶ 41. Plaintiff was the only internal candidate identified as a finalist. *Id.* ¶ 42. On December 11, 2022, one of the African American finalists withdrew his name from consideration. *Id.* ¶ 43. The other African American finalist was offered the position but declined it for compensation reasons. *Id.* On December 12, 2022, Plaintiff was told that he would not be selected for the position. *Id.* ¶ 44. Then, on December 14, 2022, Robert Tracy, the other white finalist, was selected as the Commissioner/Chief, *id.* ¶ 47, notwithstanding (1) that "the Wilmington City Council had voted no confidence in him while he was Chief of the Wilmington Police Department due to a lack of diversity in leadership positions in that department, among other things," *id.* ¶ 48; (2) that "the President of the Wilmington City Council (himself African American) had expressed concern that Tracy 'demonstrated resistance and a pattern of failure to provide information when requested, including any ideas to increase communication, transparency, diversity and police reform[,]'" *id.* ¶ 49; (3) that "the President of the Wilmington City Council publicly stated that he could not sign off on recommending Tracy for the job if he spoke with his colleagues on the St. Louis Board of Aldermen[,]" *id.* ¶ 51; and (4) that "during his tenure as Chief in Wilmington, it was reported that an African American police officer was given a trophy by a Caucasian supervisor reading, 'Whitest Black Guy in the Office Award,' which offended other African American officers[,]" *id.* ¶ 51. Plaintiff alleges, upon information and belief, that Plaintiff "was not selected for the Commissioner/Chief position because his selection after the 2 African American finalists declined it would have shown that he was always qualified to be the City's next Commissioner/Chief but was not selected before the search was reopened because he did not reflect the diversity (race) the mayor stated she wanted for the position." *Id.* ¶ 46.

Plaintiff filed a Charge of Discrimination with the EEOC on January 5, 2023. *Id.* ¶ 55. He was issued a right-to-sue letter on June 20, 2023. *Id.* ¶ 56. Shortly thereafter, he filed this lawsuit asserting the following claims:

3

    Count I:    Title VII Claim for Race Discrimination (against the City of St. Louis)

    Count II:    Violation of Plaintiff's Rights Under 42 U.S.C. § 1981 (against the City, Tishaura Jones, and Daniel Isom)

    Count III:    Violation of Plaintiff's Right to Equal Protection Under 42 U.S.C. § 1983 (against the City, Jones, and Isom)

    Count IV:    Conspiracy to Violate Civil Rights (against Jones and Isom)

Doc. [1]. Defendants move to dismiss all counts.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to give "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.544, 570 (2007)).

Determining if well-pleaded factual allegations state a "plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. A plaintiff's allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). The well-pleaded facts must establish more than a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and "grant all reasonable inferences in favor of the nonmoving party," *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009)). But if a claim fails to allege one of the elements necessary to recovery on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Although courts must accept all well-pleaded factual allegations as true, they "are not bound to accept as

4

true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

## DISCUSSION

Plaintiff asserts that Defendants' decision in May 2022 to not promote Plaintiff and to reopen the application process because of Plaintiff's race violated Title VII, 42 U.S.C. 1981, and the Equal Protection Clause.

**I.    Plaintiff has plausibly alleged that he suffered an adverse employment action.**

Defendants argue that Plaintiff has not alleged an adverse employment action because he was not denied the opportunity to compete for the Commissioner/Chief position. Plaintiff responds that Defendants' manipulation of the application process because of the race of the prevailing candidates was an adverse employment action.

A plaintiff "may establish a prima facie case of discrimination by showing that '(1) [ ]he is a member of a protected class; (2) [ ]he met [his] employer's legitimate expectations; (3) [ ]he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'"[4] *Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024) (quoting *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023)). The prima facie case is an "evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). "[I]t is unnecessary to plead enough facts to establish a prima facie case." *Ingram,* 91 F.4th at 927. That said, "the elements of a prima facie case remain relevant in determining the plausibility standard as the elements 'may be used as a prism to shed light upon the plausibility of the claim.'" *Id.* (citing *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)).

"An adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment." *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024). Recently, in *Muldrow v. St. Louis*, 601 U.S. 346 (2024), the Supreme Court "obviated the requirement—replete in [Eighth Circuit] case law—that the claimed injury be 'significant,' 'material,' or 'serious.'" *Cole*, 105 F.4th at 1114. Now Plaintiff "is only required to plead 'some harm respecting an identifiable term or condition of employment.'" *Id.*

---

[4] Plaintiff's claims under Title VII, the Equal Protection Clause, and § 1981 are analyzed under the same framework. *See Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024) ; *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 693 n.3 (8th Cir. 2009).

5

Defendants rely on *Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997).  There, the Eighth Circuit held that an employer's "alleged interest in obtaining a diverse pool of applicants can[not] support a finding of pretext" under the *McDonnell Douglas* burden-shifting analysis. *Duffy*, 123 F.3d at 1038.  The Court reasoned that the "only harm to white males is that they must compete against a larger pool of qualified applicants." *Id*. at 1039.  According to the Eighth Circuit, that "does not state a cognizable harm." *Id*.

Plaintiff denies claiming that "an employer cannot and should not consider diversity in recruiting for an open position."  Doc. [16] at 13 n.12.  Rather, he is arguing that "[a]n employer cannot invalidate a promotion process once it has been established and begun based on race, except under circumstances not present in this case." *Id*. at 6.  Plaintiff points the Court to *Ricci v. DeStefano*, 557 U.S. 557, 574 (2009), in which white and Hispanic firefighters sued the City of New Haven and some of its officials for refusing to certify exam results because white candidates had outperformed minority candidates. *Id*. at 562-75.  The City and the officials "defended their actions, arguing that if they had certified the results, they could have faced liability under Title VII for adopting a practice that had a disparate impact on the minority firefighters." *Ricci*, 557 U.S. at 563.

Analyzing the firefighters' claim, the Supreme Court began from the premise that "[t]he City's actions would violate the disparate-treatment prohibition of Title VII absent some valid defense." *Id*. at 579.  The Court noted that "all the evidence demonstrate[d] that the City chose not to certify the examination results because of the statistical disparity based on race—*i.e.*, how minority candidates had performed when compared to white candidates." *Id*.  The question before the Court was "not whether the conduct was discriminatory but whether the City had a lawful justification for its race-based action." *Id*. at 580.  The Supreme Court ultimately held "that, under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Id*. at 585.

Plaintiff argues that, as in *Ricci*, Defendants' "stated reason for not completing the established promotion process was the 'racial distribution of the results.'"  Doc. [16] (quoting *Ricci*, 557 U.S. at 584).  And therefore, as in *Ricci*, absent some valid defense, Defendants' "express, race-based decisionmaking violates Title VII[ ] . . . ." *Ricci*, 557 U.S. at 579.

6

Defendants try to distinguish *Ricci* on grounds that the plaintiffs there were "irrefutably foreclosed from the opportunity to compete for promotion," Doc. [13] at 10, whereas here, "Plaintiff was not denied the opportunity to compete for the police chief position and did, in fact, compete for that position until a member of Plaintiff's same protected group was selected instead." *Id*. But the firefighters in *Ricci* were not "irrefutably foreclosed" from competing for future promotions. They could still "be promoted in the future but not through the previously established process." Doc. [16] at 7. Taking Plaintiff's allegations to be true and drawing all reasonable inferences in his favor, something similar happened here: Plaintiff was denied an established route to promotion because of his race.

Defendants also attempt to distinguish *Ricci* by pointing the Court to *Maraschiello v. City of Buffalo Police Department*, 709 F.3d 87, 88 (2d Cir. 2013), in which a white police captain argued that the police department's "failure to promote him was impermissibly motivated by race." The police captain had "received the highest grade on the [civil service] exam and ranked first on a list of candidates that was certified on December 13, 2006." *Id*. at 89. New York law permitted the City of Buffalo to promote any of the top three scorers on the exam. *Id*. It was undisputed that the "exam qualified [the police captain] and the other two top scores for promotion to inspector at any time while the 2006 list remained in effect." *Id*. But for most of that period, there were no open positions. *Id*.

At the same time, the City of Buffalo was in the process of adopting a new police promotion exam. *Id*. The new test was developed in late 2007 and early 2008. The City of Buffalo administered the written component of the new exam for the inspector position in February 2008 and the oral component on March 31, 2008. *Id*. at 90. The police captain elected not to take the 2008 test. *Id*. On March 18, 2008, it was announced that the current inspector was retiring. *Id*. After the new test was scored on April 16, 2008, the City of Buffalo "adopted a new inspector list, and the 2006 eligibility list automatically expired." *Id*. As the police captain had not taken the test, he did not appear on the 2008 eligibility list. *Id*. at 90-91. A white male was appointed to fill the vacancy created by the current inspector's retirement. *Id*.

The police captain filed suit, alleging that he was not promoted because of his race in violation of Title VII, § 1983, and the Equal Protection Clause of the Fourteenth Amendment. *Id*. at 91. The district court granted summary judgment in favor of the defendants. *Id*. at 91-92. The police captain appealed, arguing that "he was denied his shot at [a] promotion in the same

7

way and for the same reasons as the firefighters in *Ricci*." *Id*. at 95.  The Second Circuit disagreed:

> In *Ricci*, the defendants threw out the results of a test based on the racial disparity reflected in those particular results, denying the firefighters who had taken it any chance of a promotion.  In this case, Maraschiello's results were certified, and he was eligible for a promotion for over a year.  More important, however, is the manner in which Maraschiello's eligibility expired.  Unlike in *Ricci*, where the results of a specific test were simply discarded based on the racial statistics reflected in the results, here the City replaced the 2006 list with the 2008 list after spending more than a year preparing to revise its assessment methods.  Its problem was with the test itself, rather than with a particular set of results.  The City administered the first phase of the 2008 test in February, which was before the inspector position Maraschiello desired became vacant.  Maraschiello chose not to take this test even before he knew that a position would be open.  In short, the City was already in the process of preparing to replace the eligibility list—a process in which Maraschiello chose not to participate.  This process, even though it eventually resulted in the automatic invalidation of the 2006 list, was not a rejection of that list for its own sake.

*Id*.  The Second Circuit noted that "*Ricci* specifically permits an employer to 'consider[ ], before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of race,'" *id*. at 96 (quoting *Ricci*, 557 U.S. at 585), before concluding that "[c]ompleting the last phase of a long-planned adoption of a new standard is a far cry from rejecting a set of results out of hand because of their racial makeup."  *Id*. at 96.

The differences between this case and *Maraschiello* are patent.  The defendants in *Maraschiello* did something *Ricci* explicitly permitted:  "consider[ ], before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of race."  *Ricci*, 557 U.S. at 585.  Here, taking the facts alleged in the Complaint as true, Defendants reopened an application process and changed its requirements because the two resulting candidates were white.  Such "race-based decisionmaking," absent a valid defense, is impermissible under Title VII.  *Id*. at 579.

Plaintiff has sufficiently alleged that he suffered an adverse employment action.

**II.    Plaintiff has sufficiently pleaded facts supporting his failure-to-promote claims.**

Defendants argue that Plaintiff's failure-to-promote claims fail because a white male was ultimately selected for police chief.  Doc. [13] at 12.  Plaintiff responds that he does not need to

8

make out a prime facie case of discrimination because he has presented direct evidence that he was not promoted because of his race.

"At the pleading stage in the discrimination context, it is unnecessary to plead enough facts to establish a prima facie case." *Ingram*, 91 F.4th at 927 (citing *Blomker*, 831 F.3d at 1056). One reason for that principle is that a plaintiff with direct evidence need not make out a prima facie case of discrimination, and it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered." *Swierkiewicz*, 534 U.S. at 511-12. Another is that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Id*. at 512 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). "Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases." *Id*. At this stage, the Court's role is to decide whether Plaintiff's allegations are sufficient for a reasonable factfinder to infer that Plaintiff was not promoted because of his race.[5]

Taking Plaintiff's allegations as true: He, a white male, and O'Toole, another white male, were both certified on the list of eligibles to fill the Commissioner/Chief vacancy. After O'Toole retired, Plaintiff was the only candidate remaining. Instead of selecting Plaintiff, who was "more than qualified," Defendants chose to reopen the search and lower the minimum qualifications. Doc. [1] ¶¶ 31, 34-35. That decision was inconsistent with Civil Service Rule VII, § 3(c), which provides that additional candidates can be requested only if the appointing authority is unable to fill the vacancy from the list provided. *Id*. ¶ 24. And it was made just five months after Mayor Jones publicly stated that she was not going to pick either of the candidates because both were white: "I only had two white male candidates to choose from and St. Louis is more diverse than white males, our police department is more diverse . . . ." *Id*. ¶ 81. Finally,

---

[5] Eighth Circuit precedent requires plaintiffs in reverse race-discrimination cases to also show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004)). The Supreme Court recently held that "this additional 'background circumstances' requirement is not consistent with Title VII's text or our case law construing the statute." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 305-06 (2025). Because Plaintiff's allegations are sufficient under either standard, the Court need not consider whether that decision should extend to claims outside the Title VII context for present purposes.

9

although a white male was ultimately selected for the position, that candidate was selected only after the two black candidates declined the position.

Plaintiffs' allegations are sufficient for a reasonable factfinder to infer that Defendants elected not to promote Plaintiff because of his race.[6]

### III.   Plaintiff may amend his § 1981 claim.

Defendants move to dismiss Plaintiff's standalone claim under 42 U.S.C. § 1981, arguing that such claims are barred. *See Onyiah v. St. Cloud State Univ.*, 5 F.4th 926, 929 (8th Cir. 2021) ("[W]e have repeatedly recognized the prohibition on freestanding § 1981 claims against state actors."); *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998) ("A federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983."). Plaintiff concedes that he "must pursue his § 1981 claim pursuant to § 1983," Doc. [16] at 15, and asks for leave to amend his Complaint, which the Court grants. Failure to remedy the defect in an amended complaint will result in dismissal of Count II.

Defendants also mention in passing that Plaintiff has failed "to demonstrate a contractual right or property interest in promotion as required by § 1981 . . . ." Doc. [13] at 20 n.10. As Defendants do not "support [t]his assertion with any argument or legal authority," the Court deems the issue waived. *Milligan v. City of Red Oak*, 230 F.3d 355, 360 (8th Cir. 2000); *see Jacam Chem. Co. 2013, LLC v. Shepard*, 101 F.4th 954, 963 (8th Cir. 2024) ("A party may not make bare-bones assertions 'hoping that [the Court] will do its work for it by developing the argument and putting flesh on its bones.'" (quoting *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 324 (8th Cir. 2018))).

### IV.   Defendants Isom and Jones are not entitled to qualified immunity.

"Qualified immunity shields officials from civil liability in § 1983 actions when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id*. (quoting *Nord v. Walsh Cnty.*, 757 F.3d

---

[6] Plaintiff's allegations are sufficient even under the stricter "but-for" causation standard required under § 1981. *See Benda v. Sadler Rentals, LLC*, 2023 WL 3002402, at *3 (E.D. Mo. April 19, 2023).

734, 738 (8th Cir. 2014)). "Unless both of these questions are answered affirmatively, an appellant is entitled to qualified immunity." *Id*. (quoting *Nord*, 757 F.3d at 738). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id*. (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). To defeat a defendant's claim of qualified immunity, a plaintiff "bears the burden of showing that the facts alleged, construed in the light most favorable to [him], demonstrate the violation of a constitutional right that was clearly established at the time of the violation." *Church v. Anderson*, 898 F.3d 830, 832 (8th Cir. 2018).

Because Plaintiff's claims based on Title VII, § 1981, and the Equal Protection Clause "set forth parallel, substantially identical, legal theories of recovery, [the Court] appl[ies] the same analysis to each claim." *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1237 (8th Cir. 2013). Thus, for the reasons stated in Sections I and II, the Court finds that Plaintiff has met his burden as to the first prong of the qualified immunity analysis. The Court also finds that "[t]here is no question that [Plaintiff's] right to be free from racial . . . discrimination was well-established at the time [he was not promoted]." *Wimbley v. Cashion*, 588 F.3d 959, 963 (8th Cir. 2009). "[T]he constitutional right to be free from [racial] discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Id*. (citation modified) (quoting *Wimbley*, 588 F.3d at 963). And *Ricci* makes more than "sufficiently clear" that the kind of "express, race-based decisionmaking" alleged in Plaintiff's Complaint violates Title VII. *Ricci*, 557 U.S. at 579. Because the Eighth Circuit has held that § 1981 and equal protection claims are analyzed under the same framework as Title VII, *see supra* note 4, the right Defendants allegedly violated was thus clearly established. *See Williams v. Herron*, 687 F.3d 971, 978 (8th Cir. 2012) (rejecting argument that the "clearly established right analysis" is limited to cases involving § 1983 and qualified immunity). Plaintiff has met his burden to defeat Defendants' claims to qualified immunity.

**V.     Plaintiff's § 1983 claim against the City is not foreclosed by *Praprotnik*.**

Plaintiff seeks to hold the City liable under § 1983 for violations of the Equal Protection Clause and § 1981, alleging that the discriminatory actions were "taken by those with final

11

policymaking authority and/or approved by those with final policymaking authority . . . ."[7] Doc. [1] ¶ 75. "[M]unicipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). But "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id*. at 481. The parties disagree about whether the alleged decisionmakers possessed such "final authority" with respect to the actions alleged by Plaintiff.

The City relies on the Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). There, the "Supreme Court, in a plurality opinion, held that [the Eighth Circuit] had applied an improper legal standard for determining municipal liability, and reversed [the Eight Circuit's] finding that the City of St. Louis was liable under 42 U.S.C. § 1983 for the decisions of its subordinate city officials to transfer and later terminate James H. Praprotnik, the appellee." *Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1574 (8th Cir. 1989). The Supreme Court, "[f]inding no evidence of an unconstitutional municipal policy or evidence that final policymaking authority actually rested with the supervisors responsible for Praprotnik's transfer and termination, . . . reversed and remanded the case for further review of the record and state law." *Id*.

In *Praprotnik*, the Supreme Court reiterated that "[t]he identification of policymaking officials is a question of state law . . . and not a question of fact in the usual sense." 485 U.S. at 124. And it made clear that it is a question for the Court, not a jury. *Id.* at 126. But the *Praprotnik* plurality also acknowledged that it is not a simple question. Local governments come in innumerable forms. *See id.* at 126-27. Sometimes "policymaking responsibility is shared among more than one official or body" within a single locality. *Id*. at 126. And "special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official." *Id.* While a "mere exercise of discretion by an employee" cannot give rise to municipal liability, "[i]f the authorized policymakers approve a

---

[7] Plaintiff is not alleging "a *Monell* claim against the City based on an official policy (except to the extent that an official policy can be established by one with final policymaking authority . . .), an unofficial custom, or a showing of deliberate indifference to race discrimination because not alleged in his Complaint." Doc. [16] at 16-17 (referring to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

12

subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 126-27. Recognizing the complexity of the question, after "examination of the record and state law," the Supreme Court remanded *Praprotnik* to the Eighth Circuit for application of the principles it had set forth to the record in that case. *Id.* at 131-32.

On remand, after further briefing and argument, a divided panel of the Eighth Circuit found that Praprotnik had not made a submissible case for municipal liability because "the supervisors responsible for Praprotnik's transfer and layoff . . . were not vested with final policymaking authority for making municipal policy in the area of personnel administration and layoffs. At most, these officials were entrusted with the authority for making discretionary personnel decisions in their departments." *Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1575 (8th Cir. 1989). Based on Article XVIII of the St. Louis City Charter, the Eighth Circuit found that the Civil Service Commission "possesses primary policymaking authority for making general personnel policy and for making final decisions as to individual employees." *Id.* at 1575-76. And it found no evidence that the Commission had delegated its authority to any of the supervisors responsible for Praprotnik's transfer and termination. *Id.* at 1576.

According to the City, *Praprotnik* precludes a finding that the alleged decisionmakers in this case exercised final policymaking authority over the actions alleged by Sack. The Court disagrees. As the Supreme Court acknowledged and the Eighth Circuit illustrated in *Praprotnik* itself, determining whether an official exercises final policymaking authority over the relevant area of a city's business requires careful application of state and local law to a specific set of facts. And the facts alleged by Plaintiff are significantly different from the facts of *Praprotnik*. Most notably, Plaintiff alleges that the decisions that violated his rights were made at least in part by the Mayor of the City of St. Louis—not supervisors whose decisions were appealable (and had, in fact, been appealed by Praprotnik) to the Civil Service Commission. Both the Supreme Court and the Eighth Circuit acknowledged in *Praprotnik* that St. Louis City Charter vests some policymaking authority in the Mayor. *See Praprotnik*, 485 U.S. at 126 ("Assuming that applicable law does not make the decisions of the Commission reviewable by the Mayor and Aldermen, or vice versa, one would have to conclude that policy decisions made either by the Mayor and Aldermen or by the Commission would be attributable to the city itself."); *Praprotnik*, 879 F.2d at 1576 ("The mayor and aldermen's policymaking authority . . . appears to

13

be limited to personnel matters of a more broad, all-encompassing nature (e.g., compensation rates, retirement plans, department appropriations)."). The City points to no provision of local or state law providing that decisions like those Plaintiff alleges are appealable to any higher authority, and the Complaint contains no allegation that appeal was pursued or even possible. Because the allegations in this case differ in critical ways from the facts of *Praprotnik*, the question of who exercised final policymaking authority over the actions alleged here is not answered by that decision.

At the motion to dismiss stage, the task of the Court is simply to assess whether Plaintiff's allegations state a plausible claim for relief. Plaintiff alleges that his constitutional rights were violated by the deliberate choices of City officials who had final policymaking authority with respect to those actions, at least one of whom enjoys some policymaking authority per the City Charter. Such allegations are sufficient to state a § 1983 claim against the City. *See Pembaur*, 475 U.S. at 483.

## VI.  Plaintiff's official capacity claims are dismissed as duplicative.

Plaintiff brings his § 1981 and equal protection claims against Defendant Jones in her official and individual capacities.[8] "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). "It is proper for a court to dismiss a claim against a government officer in his official capacity as duplicative or redundant if the claims are also asserted against the officer's governmental employer." *Caruso v. City of St. Louis*, 2016 WL 6563472, at *1 (E.D. Mo. Nov. 4, 2016) (citing *Veatch*, 627 F.3d at 1257). Plaintiff's official capacity claims against Defendant Jones are therefore dismissed.

## VII.  Plaintiff fails to state a claim for conspiracy.

Plaintiff alleges that Defendants and others who are not elected officials or employees of the City "reached a mutual understanding that they would not promote Sack but would reopen the applications for the Commissioner/Chief position because of Sack's race." Doc. [1] ¶ 80. In the alternative, Plaintiff alleges that "Defendants conspired among themselves and with others to undertake a course of conduct to protect each other from the consequences of their constitutional and statutory violations . . . ." *Id*. Defendants argue that Plaintiff has failed "to state a plausible

---

[8] Defendant Isom is sued in only his individual capacity. Doc. [1] ¶ 4.

conspiracy claim upon which relief may be granted and any such claim is barred by the intercorporate [sic] conspiracy doctrine." Doc. [13] at 26.

"To prove a § 1983 conspiracy claim, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). A plaintiff must do more than merely "allude to a meeting of the minds . . . . [He] must support the assertion[s] with specific allegations of collusion." *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 2011 WL 6091722, at *3 (E.D. Mo. Dec. 7, 2011) (citing *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 (8th Cir. 2005)). The intracorporate conspiracy doctrine "provides that 'a local government entity cannot conspire with itself through its agents acting within the scope of their employment.'" *Street v. Leyshock*, 41 F.4th 987, 990 (8th Cir. 2022) (quoting *L.L. Nelson Enters. v. Cnty. of St. Louis*, 673 F.3d 799, 812 (8th Cir. 2012)).

The Court turns first to whether Plaintiff has plausibly alleged that Defendants conspired with "others" to violate Plaintiff's rights. Because Plaintiff has not specified the "others" with whom Defendants allegedly conspired, the Court assumes he refers to the Boulware Group and Center for Policing Equity, the Regional Business Council, and the Saint Louis Police Foundation (the "Outside Entities"). With respect to the Outside Entities, Plaintiff's only suggestion of a "meeting of the minds" is the following allegation:

> Instead of promoting Sack consistent with Civil Service Rule VII, § 3(c), on or about May 18, 2022, Jones informed Sack and the public that she was starting a new search for Commissioner/Chief, to be conducted by the Boulware Group (managing director African American) with assistance from the Center for Policing Equity (which among other things, pursues strategies to address racist behaviors, policies, and practices in law enforcement), with the Regional Business Counsel covering any costs. Upon information an [sic] belief, no request for proposals was issued by the City before these entities were hired to be part of the new search.

Doc. [1] ¶ 34. That allegation is insufficient to support a conspiracy claim, which "'requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.'" *Faulk v. City of St. Louis*, 30 F.4th 739, 748 (8th Cir. 2022) (citing *Twombly*, 550 U.S. at 564). "Without some further factual enhancement," the bare allegation that certain entities were hired to conduct the second search "stops short of the line between possibility and plausibility . . . ."

15

*Id*. (citing *Twombly*, 550 U.S. at 557).  The insufficiency of the allegations is underlined by Plaintiff's response to the motion to dismiss, which, Defendants correctly observe, "makes no meaningful effort to argue that the Boulware Group, Center for Policing Equity, the Saint Louis Police Foundation, or any other non-state actor conspired to deprive Sack of his civil rights." Doc. [22] at 11.  Because Plaintiff's allegations do not support a plausible inference that the Outside Entities conspired with Defendants to violate Plaintiff's civil rights, the Court turns to the intracorporate conspiracy doctrine.

In *Faulk v. City of St. Louis*, the Eighth Circuit recognized that it had "never definitively addressed the issue whether the [intracorporate conspiracy] doctrine applies to § 1983 conspiracy claims."  30 F.4th at 749.  There, the Court ultimately granted the officers qualified immunity because it was not clearly established that "reasonable officers 'would . . . have known with any certainty' that planning, designing, monitoring, or executing 'the illegal kettling plan' would expose them to damage liability for a § 1983 conspiracy claim."  *Id*. at 750 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 155 (2017)).  And in *Green v. City of St. Louis*, 52 F.4th 734, 741 (8th Cir. 2022), the Eighth Circuit relied on *Faulk* to find that the defendant officers were entitled to qualified immunity:

> Our court [ ] addressed the issue of the intracorporate conspiracy doctrine's applicability to § 1983 claims in Faulk.  There, we declined to apply the doctrine to all § 1983 claims but held that, at least as of 2017, it was not clearly established that officers within a department could conspire to violate constitutional rights.  Faulk, 30 F.4th at 750.  The reasoning applied in Faulk applies in this case.  It was not clearly established at the time of the incident that officers could conspire with one another to violate a First Amendment right.  For this reason, the claim should be dismissed.

As recently as April 2025, courts in this Circuit have granted qualified immunity to officers accused of conspiring with each other.  *See, e.g.*, *Simon v. Jones*, 2025 WL 1025012, at *2 (E.D. Mo. Apr. 7, 2025) ("Given the uncertain applicability of the intracorporate conspiracy doctrine to § 1983 conspiracy claims, *see Street v. Leyshock*, 41 F.4th 987, 900 (8th Cir. 2022) (citing *Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 749 (8th Cir. 2022)), I cannot say that Jones and Scoggin would have known with any certainty that their alleged agreement to retaliate against Simon by threatening his employer's funding was clearly forbidden by law such that they would be exposed to liability for a § 1983 conspiracy claim."); *Keesee v. Johnson*, 2024 WL 216783, at *2 (E.D. Ark. Jan. 19, 2024) ("Moreover, even if the underlying conduct were unconstitutional,

16

[defendants] would be entitled to qualified immunity because they were employees of a single government entity—the city of Conway." (citing *Torres v. City of St. Louis*, 39 F.4th 494, 507 (8th Cir. 2022))); *Morgan-Tyra v. City of St. Louis*, 2022 WL 4378858, at *11 (E.D. Mo. Sept. 22, 2022) (defendant entitled to qualified immunity on the claim that he conspired with his fellow officers).  Applying the Eighth Circuit's reasoning in *Faulk* and *Green* to this case, the Court finds that Defendants are entitled to qualified immunity as to Plaintiff's conspiracy claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, Doc. [10], is **GRANTED** in part and **DENIED** in part.  An Order of Partial Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that, no later than **30 days from the date of this Order**, Plaintiff shall amend the Complaint as instructed herein.  Failure to remedy the identified defect in Count II will result in that claim's dismissal.

**IT IS FINALLY ORDERED** that, no later than **45 days from the date of this Order**, the parties shall submit a joint proposed scheduling plan.

Dated this 30th day of September, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE